**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------------X
**STUART SLEPPIN and ROBERT TEEMAN DERIVITAVELY as MEMBERS of THINKSCAN.COM, LLC, and THINKSCAN.COM, LLC,**

**Plaintiffs,**

**-against-**

**THINKSCAN.COM, LLC,**
**JOEL WEINBERGER,**
**DREW WESTEN,**
**ROBERT BORNSTEIN, and**
**IMPLICIT STRATEGIES, LLC**

**Defendants.**
---------------------------------------------------------------X

**14-cv-01387 (ADS)(ARL)**

**THIRD AMENDED COMPLAINT**

Petitioners and Plaintiffs STUART SLEPPIN ("Sleppin") and ROBERT TEEMAN ("Teeman") (collectively "Plaintiffs"), and Thinkscan.com, LLC ("Thinkscan") as and for their Third Amended Complaint for damages against Joel Weinberger ("Weinberger"), Drew Westen ("Westen"), Robert Bornstein ("Bornstein"), and Implicit Strategies LLC ("Implicit"); and for an accounting, allege as follows:

## OVERVIEW

1. The Defendants in this action stole the property and corporate opportunities of Thinkscan and used said property to open a competing business called Implicit Strategies, LLC. After the Petitioners spent years and hundreds of thousands of dollars building and financing the operations of Thinkscan, defendant Weinberger—a 50% member of Thinkscan—and defendants Westen and Bornstein decided to abandon Thinkscan and use its research, marketing materials, software, customer lists, customer relationships and other property to operate Implicit for their benefit and to the exclusion and detriment of Thinkscan, its other members, and Thinkscan's

creditors. The Defendants have been operating Implicit since 2010 and are believed to have made substantial profits as a result of their improper conduct.

## PARTIES

2. Sleppin is a member of Thinkscan and a resident of the State of New York, County of New York.

3. Teeman is a member of Thinkscan and a resident of the State of New York, County of Suffolk.

4. Respondent Weinberger is a 50% member of Thinkscan, and upon information and belief, is a resident of Queens, New York.

5. Respondent Westen was President of Thinkscan, and upon information and belief, resides in Atlanta, Georgia.

6. Respondent Bornstein was a Vice-President for Research and Creative Development at Thinkscan, and upon information and belief, resides in Westbury, New York.

7. Thinkscan is a New York limited liability company that was formed in Suffolk County on or about January 30, 2007.

8. Implicit is a Georgia limited liability company that was formed on or about December 28, 2009.

## JURISDICTION

9. This is an action for breach of fiduciary duty, misappropriation of trade secrets, usurpation of corporate opportunities, tortious interference with business, an accounting, and for an injunction.

10. Personal jurisdiction over Defendant Weinberger is premised upon C.P.L.R. § 301 as Weinberger is domiciled in the State of New York.

11. Personal jurisdiction over Defendant Bornstein is premised upon C.P.L.R. § 301 as Bornstein is domiciled in the State of New York.

12. Personal jurisdiction over Defendant Westen is premised upon Westen's prior appearance in this action on September 10, 2012. Personal jurisdiction over Westen is also premised upon New York's long-arm statute with respect to nonresidents, under C.P.L.R. §§ 302(a)(1) and (a)(3)(i). Westen was an officer in Thinkscan, a limited liability company which was created, registered, and existed in the State of New York, in accordance with the laws of the State of New York. As an officer, Westen agreed to provide his services to Thinkscan through conducting psychological analysis and research for Thinkscan clients, and performed those services for several clients. Westen also solicited business in New York on behalf of and for Thinkscan. Finally, by misappropriating property of Thinkscan, Westen committed a tortious act, which caused injury to Plaintiffs within New York State.

13. Personal jurisdiction over Defendant Implicit is premised upon Implicit's prior appearance in this action on September 10, 2012, and March 3, 2014. Personal jurisdiction is also premised upon New York's long-arm statute, under C.P.L.R. §§ 302(a)(1) and (a)(3)(i). Implicit has regularly and purposefully conducted and solicited business within New York State. Additionally, through the misappropriation of Thinkscan property, Implicit has committed a tortious act within New York State, which caused injury to Plaintiffs within New York State.

## STATEMENT OF FACTS

14. Teeman and Sleppin each have spent more than three decades working in the marketing and advertising industries. In the late 1970s, the two men started and successfully operated two marketing businesses for a number of years called Ad Counseling Productions and Teeman/Sleppin Productions.

15. Weinberger is a psychologist and longtime friend of Teeman and Sleppin.

16. Thinkscan was born out of a collaborative discussion Teeman and Sleppin had with Weinberger in the late 1990s about people's unconscious processes. At that time, Weinberger was using readily available tests and conventional methods, such as the Stroop Test, to evaluate unconscious processes.

17. Teeman and Sleppin had a vision of how the tests Weinberger was using could be developed and distributed utilizing the Internet. Given their experience, both Teeman and Sleppin were confident that they could profitably market testing tools to perform this function for the research and marketing industries.

18. On or about January 21, 1999, Teeman, Sleppin, and Weinberger formed Research.com, Inc. ("Research.com") and began developing tests and a software platform, whose purpose was to use psychologically based research procedures to enable marketing and advertising professionals to assess people's unconscious associations and reactions, integrating psychological science with neuroscience on an internet based platform.

19. Research.com was owned 25% each by Teeman and Sleppin, and 50% by Weinberger.

20. Research.com was funded by loans from entities owned and operated by Teeman, Sleppin, and their business associate, Peter Golomb ("Golomb"). Indeed, Research.com incurred approximately $141,000 of expenses that were paid for by loans that Teeman, Sleppin, and Golomb made through companies they owned.

21. The approach that Research.com used was innovative because it would allow the gathering of data from consumers in a way that had not been done previously, and would enable users of the tests to sharpen their marketing strategies and focus on whatever feelings and ideas

that provoked the strongest reactions with their customers. Utilizing the approach that Teeman, Sleppin, and Weinberger were developing on behalf of Research.com, test-users could evaluate the consumer's subconscious reactions to copy, animatics[1], photomatics[2], advertisements, trailers, taglines, product names, logos and product placement strategies.

23. Using software to automate the laborious process of testing, scrubbing data, and compiling data, several hours could be saved by simultaneously delivering tests to multiple users who could take the tests anywhere, and at any time. Likewise, automating the tests on-line would enable test results to be analyzed and used more quickly.

24. Research.com developed two tests for assessing people's unconscious processes and "gut-level" feelings using reaction times and subliminal measures, which it called the "Neural Network Mapping Test" and the "Gut Reaction Test", respectively.

25. The tests that Research.com developed consisted of reaction time measures and subliminal perception measures. Both the reaction time and subliminal perception measures had been widely used in various forms for decades. However, testing procedures using these measures were very primitive and required a considerable amount of man-hours to complete each study. Sometimes testing was done on one person at a time, Teeman and Sleppin saw these procedures as expensive and time-consuming. The goal was to expand upon and automate all aspects of these tests and procedures and put them on an Internet portal where thousands of people could take the tests and the results could also be calculated in a matter of days.

---

[1] Animatics are animated storyboards. They are used for various purposes depending on the medium for which they are being produced. Animatics are used every day in the advertising industry to test commercials.

[2] A photomatic is a series of still photographs edited together and presented on screen in a sequence. Photomatics are used by advertisers to research the effectiveness of their proposed storyboard before committing to the 'full up' television advertisement.

26. To the extent that any of the tests and the client studies were not in the public domain, they were developed exclusively for Research.com's use.

27. To that end, in 2004, Futurescape, a programming team, was hired to continue to develop and refine the software and platform that Research.com was developing to automate procedures and tests.

28. In 2005, Futurescape delivered an early version of the platform. However, it was not as robust as had been hoped for, and Research.com continued to refine it. The Futurescape effort was also unstable and prone to "crashing."

29. Consequently, in October of 2006, Research.com began to develop its own team of programmers because using an outside vendor, such as Futurescape, was proving to be very challenging.

30. In or around this time, Weinberger brought in Westen and Bornstein, two of his academic colleagues from the psychological community.

31. Everyone involved agreed that they would work without pay until Research.com became profitable. All the parties agreed that when Research.com became profitable, Teeman, Sleppin, and Golomb would be repaid the money they and their companies had loaned Research.com first, and then any profits would be distributed.

32. Teeman and Sleppin handled all aspects of operations, marketing, public relations, and sales. Weinberger, together with Teeman and Sleppin, oversaw the programming teams to develop the software that the three of them conceived. The creation of each of the client studies was a collaborative effort by Teeman, Sleppin, and Weinberger. Weinberger's main responsibility was to analyze the data that the studies produced, and create a written assessment for the client.

***Thinkscan's Formation and Platform Development***

33. In or around 2007, it was decided that a new company name was needed. One that did a better job of describing what Research.com was trying to accomplish. Sleppin secured the URL "www.thoughtscan.com", and Teeman, Sleppin, and Weinberger all agreed that "Thoughtscan" better conveyed the nature of their business. It was mutually agreed to maintain the web presence of the company as "thoughtscan.com."

34. Unfortunately, the corporate name Thoughtscan, Inc. was already taken, so the company remained incorporated as Research.com, Inc.

35. Thoughtscan.com remained the website and public face of their business until Sleppin was contacted by Wallace & Washburn, Inc. who owned the Thoughtscan trademark, and who insisted that Research.com cease using the URL "www.thougthscan.com."

36. Teeman, Sleppin, and Weinberger then agreed to come up with a new name for the company.

37. Some of the names considered were: "ScanThought.com", "accuthought.com", "thoughtsearch.com", "Thethoughtcompany.com", "thoughtprobe.com", "thinkscan.com", "verithought.com", "thoughtseek.com", "brainalyze.com", and "trupinion.com".

38. Teeman, Sleppin, and Weinberger unanimously decided to choose "Thinkscan.com." "Thinkscan.com" was available in the State of New York.

39. Larry Best, the personal accountant for Teeman, Sleppin, and Weinberger, advised Teeman, Sleppin, and Weinberger to form a new entity as a limited liability company and call it "Thinkscan.com, LLC."

40. The URL "www.thinkscan.com" was secured for the company, too.

41. Thinkscan.com, LLC was formed in New York and all of the assets and liabilities of Research.com, Inc. were transferred to Thinkscan.com, LLC.

42. A copy of a web page from New York State's Department of State showing the date of the filing for Thinkscan with the Department of State is attached as Exhibit "A."

43. After the transfer of Research.com's assets to Thinkscan, Thinkscan continued to do business as Research.com's successor. At no time did Weinberger or anyone else object to the structure of Thinkscan or the transfer of assets from Research.com to Thinkscan. In fact, Weinberger's own accountant formed Thinkscan.com, LLC.

44. Teeman, Sleppin, and Weinberger agreed that Teeman and Sleppin would each be 25 % members of Thinkscan and Weinberger would be a 50% member. This ownership structure was the mirror image of Research.com's structure.

45. This division of membership interests is reflected in tax returns for Thinkscan for the years 2008, 2009, and 2010 as well as K-ls that each of the members received.

46. Although Thinkscan was properly formed as a limited liability company under New York law, Thinkscan never adopted any operating agreement of its own.

47. New York's law governing limited liability companies provides a default operating agreement when no operating agreement is adopted by a limited liability company.

48. As a result, the default provisions of New York's Limited Liability Company Law provide Thinkscan's operating agreement.

49. Through 2009, Thinkscan continued to develop and refine the software platform, tests, and procedures that had been started at Research.com. In addition, presentation materials, a website, customer lists, marketing materials and other property was developed by Thinkscan.

50. Teeman, Sleppin, and Golomb, individually, and through other entities that they owned (collectively the "Creditors"), loaned Thinkscan the money needed to develop the software, tests, and studies, just like they did with Research.com. For example, to expedite the development of Thinkscan's software, the Creditors paid a team of dedicated programmers in Manila (the "Thinkscan Programmers") to create the Thinkscan software.

51. The Thinkscan Programmers worked for a development company that also employed other programmers who performed work for other entities owned by Sleppin, Teeman, and Golomb. Since Thinkscan was now utilizing this programming company to create the Thinkscan software and share the office facilities, it was agreed that Thinkscan would pay 20% of the Thinkscan Programmers' direct office operating expenses for its share of the office facilities. The 20% share was derived from the fact that Thinkscan employed 5 programmers and there were another 20 employees in the office space. So, in total, there were 25 employees and Thinkscan employed 20% of the 25.

52. Thinkscan was only assessed 20% of the direct operating expenses like rent, electricity, maintenance, and Internet access.

53. There were other office expenses like administrative, human resources, and bookkeeping expenses that Thinkscan incurred but were paid for by the Creditors. Further, the Creditors had an office in Manhattan that Thinkscan used as its main office and for all its meetings. The Creditors also provided bookkeeping and technical staff to work for Thinkscan.

54. The Creditors' Chief Technology Officer, Eric Hernaez ("Hernaez"), served as the Thinkscan software project manager and was named Chief Technology Officer of Thinkscan. Hernaez worked with Weinberger, Sleppin, Teeman and the Thinkscan Programmers to develop the Thinkscan software platform.

55. Eventually, Thinkscan's product reached the point that Thinkscan was ready to begin marketing its software platform. The platform Thinkscan developed was very complex. It used a combination of Flash, HTML, Java script, and ASP programming.

56. By this time, Thinkscan had refined the tests with pull-down menus and other automated features - both on the administrative portal for the people creating the tests, and on the screens that the test takers (panelists) see. Thinkscan continually studied the marketplace and refined Thinkscan's technology. Thinkscan also created elaborate screeners.

57. Each test on the Thinkscan software platform was created in a specific order, intended to capture the best possible results. The tests would start off with an introduction, followed by questions regarding the test taker's demographic information, whether the test taker was using a track pad or mouse, a priming page to prepare the test taker for the test, instructions for a practice test followed by a practice test, instructions for the color test, the color test, instructions for the subliminal test, the subliminal test, and last, a ratings page. The questions in each test -- the color test and subliminal test – were also specially crafted and put in a certain order to obtain the most concise data.

58. In July 2008, Thinkscan began to generate revenue. By this time, the Creditors had financed Thinkscan to the tune of hundreds of thousands of dollars in order to keep Thinkscan operating. The only capital that Weinberger contributed to Thinkscan was $5,000. Westen also contributed $5,000 to Thinkscan. Although Thinkscan had produced revenues of about $353,416.64, Thinkscan had expenses of approximately $688,460.94.

59. This left Thinkscan owing $335,044.30 to the Creditors.

60. Throughout 2009, Sleppin, Teeman, Weinberger, and Westen regularly communicated with and engaged in negotiations with various clients, including the New York

office of Millward Brown, the second largest marketing research company in the world, attempting to reach a licensing deal for Thinkscan. In addition to in-person meetings, hundreds of emails were sent back and forth regarding work to be performed by Thinkscan for Millward Brown and Millward Brown's clients. Eventually, Thinkscan began conducting studies and tests for Millward Brown's clients, with Weinberger and Westen engaged in the analyzing the data for Millward Brown on behalf of Thinkscan.

61. Thinkscan also signed various Non-Disclosure Agreements with its clients, including Turner, and OTX Corporation ("OTX"), as a way to protect its property by keeping all of its—Thinkscan's—"trade secrets" confidential.

62. However, in or about October of 2009, Weinberger, Westen, and Bornstein all terminated their relationships with Thinkscan, and sometime after that created a clone of Thinkscan—Implicit—and began competing against Thinkscan, including approaching Thinkscan clients for business, such as Millward Brown, Turner, and OTX, all in violation of the fiduciary duties they owed to Thinkscan, Sleppin, and Teeman. These improper actions severely damaged Thinkscan, Sleppin, and Teeman.

***Thinkscan Property***

63. Thinkscan's assets and property, included, but were not limited to: 1) the innovative way and idea of collecting subconscious data and automating it through software—the "Platform"; 2) the "Neural Network Mapping Test", an asset of Research.com that was transferred to Thinkscan; 3) the "Gut Reaction Test", an asset of Research.com that was transferred to Thinkscan; 4) the Platform software; 5) web space for www.thinkscan.com; 6) the Thinkscan website; 7) customer lists and customer relationships; 8) customer leads; 9)

presentation materials; 10) studies; 11) tests; 12) source code and user interface logic for the Thinkscan website; 13) marketing materials; 14) language developed for the Thinkscan website.

***Weinberger, Westen, and Bornstein Were Officers of Thinkscan Who Owed Fiduciary Duties to Thinkscan and Weinberger Owed Fiduciary Duties to Thinkscan as a Member of Thinkscan***

64. Weinberger, Westen, and Bornstein each held themselves out as officers of Thinkscan. For instance, at the September 2008, iMedia Brand Summit both Weinberger and Westen appeared with full knowledge that Thinkscan was organized as a limited liability company and that they were officers of the company because the agenda for Monday September 15, 2008, lists Weinberger and Westen as delivering the opening keynote, and identifies their titles as officers of Thinkscan. A copy of the agenda for iMediaBrand Summit is attached as Exhibit "B."

65. Additionally, Weinberger and Westen had business cards with their executive titles that they handed out to prospective clients to solicit business for Thinkscan, at client meetings for Thinkscan, and at conferences that they attended on behalf of Thinkscan listing their titles. Weinberger was "Chairman/Founder", and Westen was "President/Founder." Notably, their business cards clearly identify Thinkscan as a limited liability company by showing the LLC designation. A copy of the proof sheet for the business cards is attached as Exhibit "C."

64. Thinkscan's tax returns also demonstrate that Weinberger reported to the IRS that he was a 50% owner of Thinkscan, consistent with his claims to the public that he was a "founder."

65. As officers of Thinkscan, Plaintiffs entrusted Weinberger, Bornstein, and Westen with promoting the Thinkscan name and business, and believed they were loyal to the Thinkscan.

***Weinberger and Westen Leave Thinkscan To Start A Competing Business***

66. From early on, Sleppin and Teeman had the vision and the plan to automate all of Thinkscan's functionality thereby increasing productivity by eliminating time consuming data-processing. Weinberger was well aware of this and agreed to this plan. However, Weinberger nevertheless resisted certain aspects of automation. Sleppin and Teeman, along with Hernaez, had the Thinkscan Programmers automate functions that would have saved Weinberger dozens of manual hours for each study. However, Weinberger continued to resist certain aspects of automation and refused to test or use the new features.

67. Sleppin and Teeman were confident that Thinkscan could make an enormous amount of money when all of the functionality was automated and they could then license the software to the market research industry. Teeman and Sleppin believed that the key to making automation of the Thinkscan platform a reality was giving Hernaez, an ownership percentage in Thinkscan. Teeman and Sleppin suggested to Weinberger that Hernaez should be granted 10% equity in Thinkscan. And because they, either directly or indirectly, had loaned all of the Thinkscan capital, they felt that the 10% equity grant to Hernaez should come from Weinberger's share. Weinberger was enraged at this suggestion. Teeman and Sleppin were willing to negotiate and even suggested that they would contribute a 5% total share from their side and that Weinberger should also contribute a 5% of Thinkscan's equity to create a 10% equity share for Hernaez. But Weinberger rejected all attempts at negotiation.

68. For unknown reasons, Weinberger used the Hernaez equity grant discussion as a pretense to leave Thinkscan, steal its property and customer relations, and start a competing business in breach of his fiduciary duties to Thinkscan, Sleppin, and Teeman.

69. On or about October 27, 2009, Thinkscan received a letter from Weinberger and Westen's counsel, McKenna Long and Aldridge LLP. A copy of the October 27, 2009, letter (the "October Letter") from Weinberger's and Westen's counsel is attached as Exhibit "D."

70. By the October Letter, Weinberger and Westen represented that they were "no longer willing to continue in any kind of business relationship" with Sleppin and Teeman.

71. Moreover, Weinberger and Westen intended that the October Letter "serve as formal notice that Weinberger and Westen are hereby terminating any further business relationships and associations with Messrs. Sleppin and Teeman, specifically including Thinkscan."

72. Finally, by the October Letter, Weinberger and Westen actually demanded that Sleppin and Teeman "immediately dissolve Thinkscan."

73. Notably, at the time Weinberger left Thinkscan, he had been paid approximately $35,400, despite the members' agreement that no member would be paid until after Thinkscan became profitable, and despite the fact that Weinberger and Westen's financial contribution to Thinkscan was only $10,000.

74. Teeman, Sleppin, and Golomb had already invested hundreds of thousands of dollars into Thinkscan but could not continue to financially support the venture. Because of the division of membership interests, with Teeman and Sleppin in agreement, and Weinberger equally opposing them, it was impossible to operate the business.

75. The parties discussed a settlement of their differences, but no terms could be arrived at that were acceptable to the three members.

76. Weinberger and Westen opposed the continuation of the business and demanded the destruction of all copies of Thinkscan's software, and the dissolution of Thinkscan.

77. Weinberger and Westen's demand to dissolve the business was untenable and self-serving because Weinberger and Westen already had a plan to take Thinkscan's property and compete with Thinkscan, by creating their own business. Compliance with Weinberger and Westen's demand would only deprive Thinkscan of its own property and deprive Sleppin and Teeman of what they were entitled to from their loans to Thinkscan, and the time and energy they had devoted to the business.

78. In fact, before announcing that they were leaving Thinkscan, Weinberger, Westen and Bornstein began competing against Thinkscan by attempting to secure Thinkscan customers for their new business and misappropriating Thinkscan property—such as the Platform screenshots and presentation material.

78. Teeman and Sleppin were unaware that Weinberger and Westen were misappropriating Thinkscan property and customer relationships and wanted to continue the business because they had already made a significant investment of time and money.

79. In November 2009, Weinberger and Westen abandoned Thinkscan and started their own company—Implicit—in direct competition with Thinkscan.

80. Despite this, even after Weinberger announced he would have no more business relationship with Sleppin, Teeman and Thinkscan, Weinberger was still holding himself out as the Chairman and Founder of Thinkscan, like at the March 2010 "Think 2010 Key Issue Forums" of the Advertising Research Foundation. A copy of the listing of topics, presenters, and their affiliations for the Think 2010 Key Issue Forums is attached as Exhibit "E."

81. Similarly, Bornstein's "LinkedIn" profile listed him as "Vice President for Research and Development at Thinkscan.com, LLC." A copy of Bornstein's LinkedIn profile page is attached as Exhibit "F."

82. Weinberger's LinkedIn profile shows that he is the owner of Implicit. A copy of the LinkedIn profile for Weinberger is attached as Exhibit "G."

83. Even more egregious, Weinberger, Westen and Bornstein improperly, and without permission from Thinkscan, Sleppin or Teeman, misappropriated Thinkscan's property for their own use and turned Implicit into a clone of Thinkscan.

84. Specifically, Weinberger, Bornstein and Westen, upon information and belief, misappropriated for their own use the following property of Thinkscan: 1) customer lists and customer relationships; 2) potential customer lists and relationships; 3) Thinkscan presentation materials; 4) Thinkscan studies performed for customers; 5) tests that are the property of Thinkscan; 6) portions of, or the entirety of the Thinkscan software code, user interface, logic; and 7) Thinkscan marketing materials; 8) Thinkscan processes for performing tests and analyzing test results.

85. The fact that Implicit was operating the exact same business as Thinkscan is beyond dispute. For example, when describing what the companies do, Implicit stole the exact language developed by Thinkscan when Implicit wrote the following on its website:

> "Modern research in psychology and neuroscience has shown that unconscious... attitudes, ...can be measured. By making these technologies available on the Internet, we obtain results quickly and efficiently, allowing us to identify..."

86. With regard to the tests employed by each company, the language is also identical:

> "When something is on your mind—whether it's...you notice it quickly and respond to it more strongly than you respond to other things in your environment. For example, when you are at a cocktail party, all kinds of . . . are going on around you. For the most part, you do not hear them and instead focus on your own. But should someone start talking about something of interest to you or utter a word that is meaningful to you (your name, for example), you suddenly become acutely aware of the

> other conversation. Clearly your brain was processing it all along or you couldn't have noticed your name. We humans evolved to work this way— to respond on "autopilot" unless something grabs our attention, and to address it unconsciously unless it seems to require us to shine the spotlight of consciousness on it.
>
> At [Thinkscan/Implicit], we capitalize on this fact about the human brain by measuring people's reaction time in response to...
>
> It may sound easy, but a simple experiment illustrates .... Suppose the word "red" is printed in blue...and your task is to ignore the meaning of the word and indicate the color in which the word was printed. The correct response is therefore "blue." It isn't easy to do this when the word and ink color are mismatched this way because your brain is processing the meaning of the word "red" even though you have been told consciously to ignore it. Your brain is essentially saying "red" and "blue" at the same time because two different channels are giving it opposing input. If "red" is...in red, you can quickly indicate the color of the ink. But if "red" is printed in blue, you'll be slowed down by ten or twenty thousandths of a second or more.
>
> It turns out that the same principle holds for words or phrases that... recently been activated."

87. In another example, Implicit was using Thinkscan's presentations. When addressing "Brand Management" Implicit's discussion was identical to that of Thinkscan's:

> "Positioning your brand for success depends on evoking the desired ...response from your target market. Whether...advertisement...the end result should be to [promote] the positive associations that comprise your brand, and to [minimize]... negative associations...
> The problem is...traditional research methods such as surveys and focus groups rarely give you the full picture."

A copy of a side by side comparison of the websites of Thinkscan and Implicit is attached as Exhibit "H."

88. This comparison shows that Weinberger, Westen, and Bornstein—all Thinkscan officers — misappropriated, used and are using materials that were developed by and for Thinkscan, and at Thinkscan's expense. This was done in derogation of fiduciary duties of loyalty and honesty owed to Thinkscan by Weinberger, Westen, and Bornstein.

89. Similarly, upon information and belief, Weinberger, Westen, and others at the direction of Weinberger, Westen, and Bornstein, took screen shots of Thinkscan studies and sent these screen shots to software developers to reverse engineer the Thinkscan software platform.

90. Because the administrative facing panels of the Thinkscan were only accessible by the Thinkscan officers, the information within these panels—layout, format, language, and order—were only accessible to the Thinkscan officers, making it impossible for the public to access the information contained within these panels.

91. So instead of developing an original software platform for Implicit, Weinberger and Westen took screen shots of tests and studies on the Thinkscan software platform in order to directly replicate the process and order of the tests and studies through reverse engineering so that they would be able to conduct studies for Implicit's clients. Meaning, that they would be able to directly replicate the process used by the Thinkscan platform simply by looking at the copy, format, and layout of each page of the Thinkscan platform.

92. Ultimately a software platform was created for Implicit from Thinkscan's screen shots, and Weinberger's knowledge of the Thinkscan platform, which enabled Implicit to conduct studies for its clients by misappropriating Thinkscan's property. This included the order in which the studies were conducted on the Thinkscan software platform.

93. More than three months after abandoning Thinkscan, and demanding its dissolution, in February of 2010, Weinberger and Westen appeared at the CASRO Panel Conference in New Orleans touting their founding of Thinkscan and pitching their new company and product—Implicit. However, there was nothing new—they simply were using the property they had misappropriated from Thinkscan.

94. Likewise, more than four months after abandoning Thinkscan, and demanding

its dissolution, in March of 2010, Weinberger was still making public presentations touting his affiliation with Thinkscan such as the March 2010 "Re: Think 2010 Key Issue Forums" of the Advertising Research Foundation, where Weinberger held himself out as the Chairman and Founder of Thinkscan, yet pitching Implicit. See Exhibit "E."

95. Just like with Implicit's website, their presentations contained all of the copy and studies that were proprietary to Thinkscan.

96. Some of the other conferences included:

a. Drew Westen: "Consuming Passions Emotional and Unconscious Influences on Consumer Behavior" at the Custom Content Conference. March 24-26, 2010;

b. Drew Westen: "Emotional and Unconscious Influences on Consumer Behavior Mapping Implicit Networks; All in the milliseconds" At the ARF (Advertising Research Foundation), Nov 18, 2010;

c. Joel Weinberger: "Neuroscience, Biometrics and MR: Emotional and Unconscious Influences on Consumer Behavior" at The New MR.org., April 16, 2011;

d. Joel Weinberger, "NeuroMarketing 2.0 and Beyond" at The ARF: NeuroMarketing 2.0 Forum, How Advertising Works, January 12, 2012.

97. Implicit has performed work for many of the Thinkscan's customers and used the Thinkscan property to service these customers and obtain new customers.

98. Such customers include Millward Brown, who Weinberger and Westen negotiated with before they announced that they were leaving Thinkscan in order to bring Millward Borwn to their new company. They continued to solicit Millward Brown after they announced that they were leaving.

99. In an email exchange with Millward Brown entitled "Thinkscan Discussion" in late-December 2009—right after Weinberger and Westen abandoned Thinkscan—Weinberger and Westen pursued a business relationship between Millward Brown and newly formed

Implicit, by "moving forward with a licensing agreement with MB", even though they knew that Thinkscan had been in the process of negotiating such an agreement with Millward Brown when they abandoned Thinkscan.

100. In an attempt to get Millward Brown's business, Westen disparaged Thinkscan to Millward Brown, referring to it as "a fiasco."

101. Implicit also pursued Thinkscan client, Turner, and performed work for them using Thinkscan's property by conducting studies and writing a report on their findings not even a full month after Weinberger and Westen abandoned Thinkscan.

102. Implicit even performed work using Thinkscan's property for OTX, another one of Thinkscan's clients, again not even a full month after Weinberger and Westen abandoned Thinkscan.

104. Weinberger and Westen used Thinkscan property and removed any trace of Teeman, Sleppin, and Thinkscan so that Thinkscan's property could be passed off as Implicit's.

105. For example, in January 2010, Weinberger asked Larry Heiser to confirm that "all traces of BS are gone?" from a Thinkscan presentation that Implicit stole and planned to use for their business. Heiser was told to delete all traces of Bob [Teeman] and Stuart [Sleppin] from a presentation that was created by and property of Thinkscan, so that Implicit could use it without Teem and Sleppin's knowledge or permission. This was just a month after Weinberger and Westen abandoned Thinkscan.

106. In that same email exchange, Larry Heiser confirmed that "all traces of BS and TS have been removed", meaning he had successfully removed traces of Bob [Teeman], Stuart [Sleppin], and Thinkscan.

107. Weinberger and Westen compounded their breach of fiduciary duty just two months later, in March 2010, Weinberger and Westen emailed Larry Heiser about the possibility of copying the Thinkscan platform itself. Weinberger and Westen knew they were breaching their fiduciary duties, acknowledging that their activities might "piss these guys off" or make "them feel like we're steeling [sic] something from them."

108. In the email exchange, Westen admitted that the Thinkscan platform, its tests and studies were property of Thinkscan, and asked Larry Heiser, "what's the chance they'd detect anything, and would you be doing anything that would be taking anything genuinely proprietary, which we wouldn't want to do?"

109. Larry Heiser responded with, "I will just take screen shots" and proceeded to do so of a study conducted by Thinkscan for one of Thinkscan's clients, OTX. See Exhibit "U."

110. Defendants, through their company Implicit, have profited from their breach of fiduciary duties and misappropriation of the Thinkscan property.

111. Because it would be futile for Thinkscan to request that Weinberger sue himself, to the extent that any of these claims must be brought derivatively, demand is not necessary.

**I. BREACH OF FIDUCIARY DUTY BY WEINBERGER, WESTEN, AND BORNSTEIN (Individually and Derivaticly on Behalf of Thinkscan)**

113. Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 112 of this Petition as if set forth at length herein.

114. Weinberger, as a member and officer of Thinkscan, owed fiduciary duties to Thinkscan, and the other members of Thinkscan.

115. Westen and Bornstein as officers of Thinkscan owed fiduciary duties to Thinkscan.

116. Weinberger, Westen, and Bornstein improperly, and without permission, or

Justification, misappropriated Thinkscan's property for their own use and Implicit's use.

117. This misappropriation of Thinkscan's property constitutes a breach of Weinberger's, Westen's, and Bornstein's fiduciary duties to Thinkscan, and to Sleppin and Teeman.

118. Weinberger, Westen, and Bornstein further violated their fiduciary duties that they owed to Thinkscan, Sleppin and Teeman, by improperly competing with Thinkscan while they were members and/or officers of Thikscan by establishing and operating a businesses that competed directly with Thinkscan by using Thinkscan's customers, trade secrets and property.

119. As a result of Weinberger's, Westen's, and Bornstein's breaches of fiduciary duties, Sleppin, Teeman and Thinkscan suffered damages in an amount to be determined at trial, but not less than $300,000.

120. These damages include, but are not limited to any income generated by Implicit by its use of Thinkscan's property and its competition with Thinkscan in the same line of business.

121. Alternatively, to the extent that this claim must be brought derivatively, the allegations are repeated herein as Teeman and Sleppin bringing derivative claims on behalf of Thinkscan.

**II. MISAPPROPRIATION OF THINKSCAN'S TRADE SECRETS BY WEINBERGER,WESTEN, BORNSTEIN AND IMPLICIT**

122. Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 121 of this Amended Complaint as if set forth at length herein.

123. Weinberger, Westen, Bornstein and Implicit improperly took and used Thinkscan's property and trade secrets without Thinkscan's permission.

124. Thinkscan's trade secrets were and are of tremendous value to Thinkscan, with Sleppin and Teeman having spent hundreds of thousands of dollars on their creation and implementation.

125. Thinkscan even signed Non-Disclosure Agreements with its clients to keep their trade secrets confidential.

126. It is against equity and good conscience for Weinberger, Westen, Bornstein, Implicit to have taken and used Thinkscan's property, such as the order and processes used by the Thinkscan software platform, language from the Thinkscan website and Thinkscan presentations, Thinkscan customer lists and customer relationships, and Thinkscan studies and tests without Thinkscan's permission.

127. Thinkscan's property was not available to the public, with all client lists, tests, studies and processes maintained and kept only by Thinkscan, its members, and officers.

128. For example, administrative facing panels of Thinkscan tests were only accessible by Thinkscan officers, including their layout, format, language, and order, so it was impossible for anyone in the public to access the information contained within the panels.

129. Weinberger, Westen, Bornstein, and Implicit retained and used Thinkscan's property without payment or permission.

130. No other company or person had access to the Thinkscan platform and/or process.

131. As a result of the wrongful and unlawful misappropriation of Thinkscan's trade secrets by Weinberger, Westen, Bornstein and Implicit Strategies, Thinkscan has suffered damages in an amount to be determined but believed to be at least $335,044.30 and to include the income generated by Weinberg, Westen, and Bornstein, by and for Implicit.

## III. TORTIOUS INTERFERENCE WITH THINKSCAN'S BUSINESS BY WEINBERGER, WESTEN, AND IMPLICIT STRATEGIES, LLC

132. Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 131 of this Amended Complaint as if fully set forth herein at length.

133. Thinkscan established business relationships with a number of clients, such as Millward Brown, Turner, and OTX, which Thinkscan conducted tests and studies for.

134. Throughout 2009, Thinkscan was even engaged in negotiations with Millward Brown for a licensing deal regarding the Thinkscan platform.

135. Weinberger and Westen had access to these clients, and their appropriate contact information, only because Weinberger and Westen were a member and officer of Thinkscan, respectively.

136. Despite being fully aware of Thinkscan's on-going business relationship with Millward Brown and continuing negotiations, just two months after Weinberger and Westen left Thinkscan, they began pursuing a business relationship between Implicit and Millward Brown, including a licensing deal with Implicit.

137. In order to improve the chances of working with Millward Brown, Westen made disparaging remarks about Thinkscan, maliciously referring to it as "a fiasco", thereby harming Thinkscan's reputation and working relationship with Millward Brown.

138. Weinberger and Westen also pursued Thinkscan clients Turner and OTX, and not even two months after leaving Thinkscan began conducting studies for Turner and OTX under Implicit.

139. Thinkscan's business relationship with Millward Brown, Turner, and OTX ceased once Weinberger and Westen began conducting studies and tests for them as Implicit.

140. As a consequence of Weinberger, Westen, and Implict knowingly interfering with Thinkscan's relationship with Millward Brown, OTX, and Turner and maliciously injuring Thinkscan's business relationship with them, have suffered damages at least equal to the value of the opportunities diverted by Weinberger, Westen, and Implicit, and for punitive damages in an amount to be determined at trial.

**IV. USURPATION OF CORPORATE OPPORTUNITIES BY WEINBERGER, WESTEN, BORNSTEIN AND IMPLICIT STRATEGIES**

141. Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 140 of this Amended Complaint as if fully set forth herein at length.

142. Weinberger, Westen, and Bornstein owed fiduciary duties of loyalty and honesty to Thinkscan.

143. By virtue of their positions with Thinkscan, Weinberger, Westen, and Bornstein had access to certain business opportunities, such as with Millward Brown, OTX, and Turner that were developed prior to them announcing that they were leaving Thinkscan.

144. Weinberger, Westen, and Bornstein diverted those business opportunities that were rightfully Thinkscan's for their own use and benefit at Implicit.

145. Thinkscan suffered damages as a result of Weinberger's, Westen's, and Bornstein' s diversion of those opportunities.

146. Alternatively, to the extent this claim belongs to Thinkscan, this cause of action is brought derivatively on behalf of and for the benefit of Thinkscan.

**IV. FOR AN ACCOUNTING**

148. Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 147 of this Complaint as if fully set forth herein at length.

149. Weinberger, Westen and Bornstein breached fiduciary duties owed to

Plaintiffs and Thinkscan.

150. Weinberger, Westen, and Bornstein took possession of Thinkscan's property and have failed to account therefore.

151. As a result of the foregoing, Weinberger, Westen, and Bornstein should be ordered to provide Plainitffs and Thinkscan with a full accounting of Implicit Strategies for any funds received as a result of this misappropriation, and unauthorized use of Thinkscan's property.

**WHEREFORE** Plaintiffs respectfully demand permanent injunctive relief, and damages, and orders as follows:

A. An order directing that all of Thinkscan's property, for example, software platform, tests, studies, presentation materials, marketing materials, customer lists and information, and other property, is assigned to the Creditors in satisfaction of the debts owed to the Creditors;

B. Damages in an amount to be determined at trial, but at least $335,044.30 on cause of action I through IV.

C. For any other relief as the Court may deem just and proper.

Dated: New York, New York
March 27, 2014

SADIS & GOLDBERG, LLP

Douglas Hirsch, Esq.
Jennifer Rossan, Esq.
Michelle Tanney, Esq.
*Attorneys for Plaintiffs*
551 Fifth Avenue, 21st Floor
New York, New York 10176
(212) 947-3793